IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JEFFREY CORPORAL,

    Plaintiff,

    v.

ACTING ASST. WARDEN BUTLER,
LT. JAMES J. SMITH,
CCMS CORY M. WALKER,
CCMSII JOSEPH R. JEFCOAT,
CCMSII RODNEY L. DAVIS,
COMMISSIONER O. WAYNE HILL,
SECRETARY ROBERT GREEN,

    Defendants.

Civil Action No.:  DKC-20-1809

**MEMORANDUM OPINION**

Defendants Acting Assistant Warden Bradley O. Butler, Commissioner of Corrections/Deputy Secretary of Operations O. Wayne Hill, Secretary Robert Green, CCMSII Rodney L. Davis, CCMS Cory M. Walker, CCMSII Joseph R. Jefcoat, and Lieutenant James J. Smith,[1] in response to the civil rights complaint filed against them, filed a motion to dismiss or in the alternative for summary judgment.  ECF No. 9.  Self-represented Plaintiff Jeffrey Corporal opposes the motion.  ECF No. 10.  No hearing is deemed necessary.  *See* Local Rule 105.6 (D. Md. 2018).  For the reasons that follow, summary judgment will be granted in favor of Defendants.

BACKGROUND

A.    Complaint Allegations

Mr. Corporal, an inmate committed to the custody of the Maryland Division of Correction and confined in Western Correctional Institution ("WCI"), is a former correctional officer

---

[1]    The Clerk is directed to amend the docket to reflect the full and correct spelling of Defendants' names as reflected in the caption of this Memorandum Opinion.

employed in the Division of Pre-Trial and Detention Services.  Mr. Corporal was employed in that capacity from 2003 to 2006 and was discharged from his job on March 7, 2006, just before his arrest and conviction on charges of armed robbery for which he received a sentence of 40 years. *See* ECF No. 9-2 at 3 (Memorandum from C.W. Walker, Acting CCMM to Rodney Davis, CM for Admin. Segregation).  It is Mr. Corporal's unwavering belief that his former employment status makes him a target for assault or other violence by other inmates.  *Id*.  Mr. Corporal has remained on protective custody, administrative segregation, or disciplinary segregation since he was committed to the Division of Correction in 2006.  *Id*.

On April 3, 2020, Mr. Corporal received notice that Assistant Warden Butler approved a March 26, 2020, decision by a case management team to remove Mr. Corporal from protective custody ("PC").  ECF No. 5-1 at 2.[2]  The case management team consisted of Defendants Walker, Davis, Jefcoat, and Smith.  ECF No. 1 at 3.  Mr. Corporal states that he did not "consent" to his removal from PC or administrative segregation.  *Id*.  He explains that he has been on PC since 2006 and Defendant Walker later made the decision to confine him to administrative segregation pending an investigation following his refusal to accept a cell with a cellmate on July 26, 2019. *Id*.

Mr. Corporal notes that the March 26, 2020, decision was made twenty-four days after he filed a civil lawsuit in this court naming Warden Weber and other correctional officers as defendants.  *See Corporal v. Carr, et al.*, Civil Action No. DKC-20-534 (D. Md. 2020).  Mr. Corporal states that "[c]onsequently Defendants Walker's recommendation; Lt. Smith, Davis and Jefcoat's concurrence; and Butler's approval removing [him] from PC without [his] consent was evidently . . . retaliation against [him]" for the federal lawsuit.  ECF No. 5-1 at 3.  He further claims

---

[2]    Mr. Corporal amended his complaint to include more allegations against Defendant Walker but appears to incorporate his original complaint in the amended complaint.  ECF No. 5.

that a lawsuit he filed against Warden Weber and Lt. Smith, among others, was served on those defendants on March 31, 2020, and the decision to remove him from PC is "a concerted attempt at deterring [him] from continuing those suits."  ECF No. 1 at 3, *see also Corporal v. Lt. Smith et al.,* Civil Action No. DKC-19-3490 (D. Md. 2019).

According to Mr. Corporal, Lt. Smith was not a case manager at the time the decision was made to remove him from PC.  ECF No. 1 at 5.  He claims that it was a violation of prison policy for Smith to act in the capacity of a case manager and states that he was allowed to participate in the process despite Mr. Corporal filing "multiple prison grievances" against Lt. Smith and a civil action regarding an alleged excessive use of force.  *Id.*, *see also Corporal v. Lt. Smith*, Civil Action No. DKC-20-1193 (D. Md. 2020).

Mr. Corporal also claims that Commissioner Hill and Secretary Green violated his federal civil rights because he was denied access to any procedural protections such as a formal hearing and an appeal process.  ECF No. 1 at 6.  He states that it is "pursuant to their policy" which includes COMAR 12.02.28.4.B.1, that any grievances he endeavors to file, challenging his removal from PC, must be procedurally dismissed.  *Id.*  Mr. Corporal alleges that the actions of Defendants have caused him to suffer stress and anxiety.  *Id.* at 7.

Mr. Corporal alleges that Case Managers Walker, Davis, and Jefcoat, Lt. Smith and Assistant Warden Butler violated his First Amendment right of access to courts when they recommended removing Mr. Corporal from PC twenty-four days after he filed a lawsuit in this court.  ECF No. 1 at 10.  He additionally alleges that Lt. Smith violated his Fourteenth Amendment right to due process "because he was not a case manager and was therefore prohibited by prison policy when he concurred with case managers' decision to remove [him] from PC."  *Id.*  He claims that Secretary Green and Commissioner Hill also violated his right to due process when they failed to provide a formal procedure by which he could challenge his removal from PC.  *Id.* at 11.  As

3

relief, Mr. Corporal seeks compensatory damages of ten-million dollars, punitive damages of one-hundred thousand dollars, and nominal damages of one-hundred dollars, as well as a declaratory judgment stating that protective custody prisoners are entitled formally to challenge an involuntary removal from PC.  ECF No. 1 at 13.

B.     Defendants' Response

Cory Walker, who is a Case Management Supervisor at WCI, states in his declaration that he made a recommendation to remove Mr. Corporal from PC on March 26, 2020, and place him on administrative segregation pending investigation.[3]  ECF No. 9-2 at 1, ¶¶ 3, 4.  That recommendation was approved by Acting Warden Butler.  *Id*. at ¶ 3.  Mr. Walker mentions an incident that occurred on December 5, 2019, involving Mr. Corporal's threat to assault his cellmate, Joshua Littlewolf.  *Id*. at 1, ¶ 5.  Mr. Walker explains that Mr. Corporal has "continually told staff that he will not accept a cell partner and will assault whoever they attempt to place in his cell."  *Id*.

Included with the verified records attached to Mr. Walker's declaration is his report to Rodney Davis dated March 26, 2020, regarding his investigation into Mr. Corporal.  ECF No. 9-2 at 3-4.  Mr. Walker summarized Mr. Corporal's housing issues as follows:

> While serving his commitment within [Department of Public Safety and Correctional Services] DPSCS, Corporal has remained on special housing status. Since 2006, Corporal has remained on protective custody and either administrative or disciplinary segregation.  His overall adjustment history signifies an ongoing housing and behavior concern.  Corporal's contempt for staff remains as consistent with a belief that he should be single celled.  On 8/3/2008, WCI case management classified Corporal to Medium security.  He transferred to [Eastern Correctional Institution] ECI on 11/6/2008.  On 5/21/2009, Commissioner of Corrections increased security to MAX I and Corporal returned to WCI.  Noted in the security review, Corporal had multiple assaults on cellmates and refusing housing.

---

[3]     Mr. Walker does not state what the investigation concerns, nor does he explain what will occur with Mr. Corporal's housing status after the investigation is completed.  ECF No. 9-2 at 1-2.

4

Overall adjustment report indicates a systematic behavior brought into years of fruition through violence and non-compliance.  While assigned to the protective custody unit and between stints on segregation, Corporal has failed to complete any programming and served minimal institutional employment.

Since the time of PC placement, inmate Corporal has further attempted to manipulate for single cell status.  Corporal's employment with Division of Pre-Trial services prior to incarceration no longer serves as justification for protective custody.  Sufficient time has elapsed from initial reception to show a behavior that ultimately disrupts the security of the protective custody unit.  As such, there is no additional information to indicate that inmate Corporal cannot be housed in general population, as there was never a clear threat to validate placement other than past employment.  Further consultation with Psychology M. Gordon (LCPC) notes a diagnosis of M.I. (mental illness).  Corporal's mental status was within normal limits during the last segregation review meeting on 2/28/2020.  At his request, Corporal was referred to psychiatry but has not followed treatment recommendations and has not sought out any additional services.

In conclusion, Inmate Jeffrey Corporal's initial placement on protective custody status 14 years ago served as a means to address his security issues at that time.  These security issues have been addressed.  Enemies have been documented accordingly.  It is my recommendation that further protective custody placement is no longer warranted.

ECF No. 9-2 at 3-4.  Prior to this report, Mr. Walker wrote another report on August 9, 2019,

indicating that Mr. Corporal believes he should be single-celled and refused to accept a new

housing assignment initiated for purposes of "re-population efforts and redesignation of Protective

Custody unit to HU#5-B tier from HU#4-C tier."  *Id*. at 13.  Mr. Walker noted in this report that

Mr. Corporal would be referred to the psychology department because the attempt to change his

housing assignment "was exasperating to his mental health."  *Id*.

In his declaration, James Wilson, who is a Case Management Manager at WCI, states that

Mr. Corporal was removed from administrative segregation on June 3, 2020, by Assistant Warden

Butler, but he refused his housing assignment on June 5 and 19, 2020.  ECF No. 9-3 at 1, ¶ 3.  On

June 23, 2020, Warden Weber sent Mr. Wilson a copy of a letter Mr. Corporal wrote to Secretary

Green[4] and advised Mr. Wilson that Mr. Corporal should be placed back on administrative segregation and proper housing for him should again be reviewed. *Id*. at ¶4. In his letter to Secretary Green, Mr. Corporal stated that the "Correctional Officers" at WCI "are actively trying to set [him] up to be murdered by gang members in the general inmate population" and he demanded to be put back on PC. ECF No. 9-3 at 33. Additionally, Mr. Corporal indicated his belief that the decision to remove him from PC amounted to retaliation for filing a federal lawsuit on March 2, 2020, and that his former employment as a correctional officer made his assignment to general population untenable. *Id*.

Mr. Corporal received a Notice of Inmate Rule Violation on June 5, 2020, for refusing to move from administrative segregation to general population. ECF No. 9-3 at 6. He pled guilty to violating two rules (316 disobeying a direct order and 402 refusing a housing assignment) in exchange for a 15-day segregation sentence. *Id*. at 9.

On June 19, 2020, Mr. Corporal received another Notice of Inmate Rule violation in connection with his refusal to move into general population. ECF No. 9-3 at 19. After he pled guilty for again violating Rules 316 and 402, he was sentenced to 30-days of segregation. *Id*. at 22, 24.

C.    Opposition Response

Mr. Corporal takes issue with statements in the reports regarding his need for PC that indicate he refused mental health treatment. A March 13, 2020, response to his request to M. Gordon to provide information about his mental health diagnosis and whether he refused treatment is attached to his complaint. ECF No. 1-2 at 6. That response states that Mr. Corporal has been

---

[4]    In his letter to Secretary Green, Mr. Corporal stated that he feared for his safety. ECF No. 9-3 at 32-34.

diagnosed with "Anxiety NOS and Depression NOS" and that there is no documentation showing that Mr. Corporal refused treatment from psychology staff.  *Id.*

In Mr. Corporal's declaration in opposition to Defendants' motion, he states that Mr. Walker's declaration that "he recommended my removal from Protective Custody on March 26, 2020 in order for him to investigate a December 5, 2019 incident in which I attempted to assault my then-cell mate Joshua Littlewolf" is in essence false.  ECF No. 11 at 1-2.  He claims that he never threatened Mr. Littlewolf and never attempted to assault him.  *Id*. at 2.  He alleges that Lt. Smith falsified the report about Mr. Littlewolf in an attempt to cover up an assault on Mr. Corporal. *Id*.  He concludes that Mr. Walker simply recommended his removal in retaliation for his legal activity and that Mr. Walker never investigated the incident.  *Id*.

STANDARD OF REVIEW

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc*., 477 U. S. 242, 247-48 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'"  *Bouchat v. Baltimore Ravens Football Club, Inc*., 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)).  The court should

7

"view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 645 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

## ANALYSIS

Defendants assert that Defendants Hill and Green were not personally involved in the determination to remove Mr. Corporal from PC and should be dismissed from the suit on that basis. ECF No. 9-1 at 7-8. Additionally, they argue that Mr. Corporal has failed to state a viable claim of retaliation, there are no due process protections for decisions regarding housing assignments, an alleged violation of State policy is insufficient to state a claim, they are entitled to Eleventh Amendment immunity for claims brought against them in their official capacity, claims that do not allege a physical injury are barred by 42 U.S.C. § 1997e, and they are entitled to qualified immunity. *Id*. at 8-15.

A.    Personal Participation

Liability under § 1983 attaches only upon personal participation by a defendant in the constitutional violation. It is well established that the doctrine of respondeat superior does not apply in § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983); *see also Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001) (no respondeat superior liability in a Bivens suit). Liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the

8

constitutional injuries they inflict on those committed to their care.'"  *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). Supervisory liability under § 1983 must be supported with evidence that:  (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).

Mr. Corporal's claim against Secretary Green and Commissioner Hill is their asserted failure to have a procedure in place by which he can challenge the decision to remove him from protective custody or otherwise change his housing assignment.  ECF No. 1 at 11.  The only action taken by Secretary Green in the context of Mr. Corporal's housing assignment was to direct his placement into administrative segregation pending investigation after receiving a letter from Mr. Corporal stating that his life was endangered.  ECF No. 9-3 at 1, ¶ 4.  That directive does not support Mr. Corporal's assertion that Secretary Green is somehow liable for endangering his safety.  Further, neither Secretary Green nor Commissioner Hill are obliged by the Fourteenth Amendment to the Constitution to ensure that all complaints from Maryland prisoners have an avenue for administrative review.  "[G]iven a valid conviction, the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the Constitution."  *Meachum v. Fano*, 427 U.S. 215, 224 (1976), s*ee also Sandin v. Conner*, 515 U.S. 472, 493 (1995), requiring an atypical and significant hardship as prerequisite to creation of

a constitutionally protected liberty interest.  Secretary Green and Commissioner Hill are therefore entitled to summary judgment in their favor.

B.    Retaliation

"The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000).  To state a claim of retaliation for exercising First Amendment rights, a plaintiff must show that (1) the plaintiff engaged in protected First Amendment activity; (2) the defendant took some action that adversely affected the First Amendment rights; and (3) there was a causal relationship between the protected activity and the defendant's conduct.  *See Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005).

While "the constitutional rights that prisoners possess are more limited in scope than the constitutional rights held by individuals in society at large," "incarceration does not divest prisoners of all constitutional protections."  *Shaw v. Murphy*, 532 U.S. 223, 228–29 (2001).  "[A] prison inmate retains those First Amendment rights that are not inconsistent with the status as a prisoner or with the legitimate penological objectives of the corrections system."  *Pell v. Procunier*, 417 U.S. 817, 822 (1974).  An inmate's "right to file a prison grievance free from retaliation" is protected by the First Amendment.  *Booker v. S. Carolina Dep't of Corrections*, 855 F.3d 533, 545 (4th Cir. 2017).

The Fourth Circuit recently restated the burden-shifting approach applicable to a claim of retaliation in the prison context in *Martin v. Duffy*, 977 F.3d 294 (4th Cir. 2020).  The court acknowledged that "even when inmates are part of the general population, prison policies strictly circumscribe their schedule, placement, and ability to interact with those around [them]."  *Id*. at 300.  The court further observed that:

These restrictions often further legitimate penological interests, but they also create a stark asymmetry in inmates' and prison officials' access to information about the prison's decision-making process.  If, notwithstanding these hurdles, an inmate shows that protected conduct was a substantial or motivating factor in a prison guard's decision to take adverse action, it is appropriate that the burden of proving a permissible basis for taking that action then shifts to the person who took it.

*Id*.

Mr. Corporal pins his retaliation claim to the "temporal proximity" between the time he filed lawsuits in this court and the decision to remove him from protective custody.  *See Constantine*, 411 F.3d at 501.  While that element may serve to demonstrate a causal connection between a First Amendment right of access to courts and the asserted retaliatory action in some instances, it is not the case here.  The verified business records submitted by Defendants establish that the decision to remove Mr. Corporal from protective custody pre-dates his civil litigation by approximately seven months.  *See* ECF No. 9-2 at 13 (investigative report from Aug. 2019 noting "re-population efforts and redesignation of Protective Custody unit to HU#5-B tier from HU#4-C tier" as impetus for Mr. Corporal's reassignment).  Additionally, the record demonstrates that the legitimate concern behind efforts to get Mr. Corporal into the general population was his long-term isolation, lack of access to any programming, and the lack of any evidence that there is a verified threat to his safety.  Defendants are entitled to summary judgment in their favor on the retaliation claim.

C.      Due Process Claim

Prisoners have a liberty interest in avoiding confinement conditions that impose "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995) (citing *Wolff v. McDonnell*, 418 U.S. 539); *Wilkinson v. Austin*, 545 U.S. 209, 210 (2005).  Whether confinement conditions are atypical and substantially harsh "in relation to the ordinary incidents of prison life" is a "necessarily . . . fact specific"

comparative exercise.  *Beverati v. Smith*, 120 F.3d 500, 502-03 (4th Cir. 1997) (quoting *Sandin*, 515 U.S. at 483-84); *accord Ramirez v. Galaza*, 334 F.3d 850, 861 (9th Cir. 2003) ("There is no single standard for determining whether a prison hardship is atypical and significant, and the condition or combination of conditions or factors . . . requires case by case, fact by fact consideration." (alteration in original) (internal quotation marks omitted)).  "*Wilkinson* does not hold that harsh or atypical prison conditions in and of themselves provide the basis of a liberty interest giving rise to Due Process protection."  *Prieto v Clarke*, 780 F.3d 245, 250 (4th Cir. 2015).  Rather, there must exist an interest in avoiding "erroneous placement [in the challenged confinement] under the state's classification regulations *combined with* . . . harsh and atypical conditions" for Due Process protections to apply.  *Id.* (emphasis in original) (citing *Wilkinson*, 545 U.S. at 224-25).

Affording Mr. Corporal's allegation liberal construction, his claim appears to be that he has a liberty interest in avoiding potential threats to his safety and well-being.  While it is his view that this can only be accomplished if he remains in protective custody and/or in a single cell, he has not described an existing threat to his safety amenable to investigation or proof beyond his former employment which ended almost fifteen years ago.  This court does not suggest that Mr. Corporal's fears and anxieties are not real to him.  However, his failure to describe an objective basis for those fears illuminates the very issue correctional officials are faced with in striking a balance between managing housing assignments and investigating claimed threats of harm.  It does appear that at one time there was a legitimate concern about placing Mr. Corporal in the general population at the beginning of his prison term due to his former employment, there is nothing in the record to suggest that the initial concern was a permanent one.  Finally, there is evidence here that the case management team investigated Mr. Corporal's claims that general population was not safe for him and found nothing to substantiate it.  Even so, he was placed back in administrative

segregation pending an investigation after he reiterated his fears to Secretary Green. On this record it cannot be said that Mr. Corporal's housing assignment has not been given due consideration. The Defendants are therefore entitled to summary judgment on this claim.

D.     Violation of State Policy

Mr. Corporal claims that Lt. Smith's participation in a case management decision violated State policy because he is not a case manager. ECF No. 1 at 10. However, a violation of prison policy alone does not state a Fourteenth Amendment due process violation. *See Myers v. Klevenhagen*, 97 F.3d 91, 94 (5th Cir. 1996); *Kitchen v. Ickes*, 116 F. Supp. 3d 613, 629 & n.6 (D. Md. 2015) (citing *Myers*). Thus, even assuming that there is some policy or regulation prohibiting Lt. Smith's participation in case management decisions, which Mr. Corporal fails to cite, that fact alone does not amount to a violation of the Fourteenth Amendment.[5]

E.     Injury Alleged

To state a civil rights claim, a prisoner must allege that he, himself, sustained a deprivation of right, privilege, or immunity secured by Constitution or federal law. *See Inmates v. Owens*, 561 F.2d 560, 563 (4th Cir. 1977). To demonstrate standing, "Plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *See Allen v. Wright*, 468 U.S. 737, 751 (1984) (abrogated on other grounds by *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 134 S.Ct. 1377 (2014)). More recently, the Fourth Circuit observed that "[t]he Prison Litigation Reform Act . . . bars suits for mental or emotional injury unless there is a prior showing of physical injury." *Duffy*, 977 F.3d at 301.

---

[5]     Mr. Corporal's claim against Lt. Smith for an alleged use of excessive force in connection with events that occurred on December 5, 2019, is a matter that is still pending before this court and will not be addressed here. *See Corporal v. Smith*, Civil Action No. DKC-20-1193 (D. Md. 2020).

Mr. Corporal's sole claimed injury is "stress and anxiety."  ECF No. 1 at 7.  Absent from the record is any indication that Mr. Corporal has suffered a physical injury.  Such a claim is barred by 42 U.S.C. § 1997e(e).

CONCLUSION

This court finds that Defendants are entitled to summary judgment in their favor on the record evidence presented.  In light of that finding, the court does not address Defendants' assertion of immunity and qualified immunity defenses.

A separate Order follows.


<u>March 2, 2021</u>                                                 /s/
                                                 DEBORAH K. CHASANOW
                                                 United States District Judge

14